Filed 4/29/16  P. v. Rivera CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ROGELIO ARROYO RIVERA,<br><br>    Defendant and Appellant. | G051375<br><br>(Super. Ct. No. 12NF1079)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Michael J. Cassidy, Judge.  Affirmed in part and reversed in part, with directions.

Thomas E. Robertson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., Anthony DaSilva and Susan E. Miller, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted Rogelio Arroyo Rivera of numerous criminal offenses, including as relevant here, kidnapping (Pen. Code, § 207, subd. (a), count 3; all further statutory references are to this code), two counts of threatening to kill his daughter, B.R. (§ 422, subd. (a), counts 5 and 7), and making a similar criminal threat to B.R.'s mother, M.H. (*ibid.*, count 8). The jury also found various penalty enhancements to be true, as did the trial court concerning prior prison term and serious or violent felony allegations, resulting in an aggregate prison term of 35 years on all counts. Rivera contends we must reverse his conviction on count 7 because any threats he made against his daughter were part of a continuing course of conduct in which he caused her only a single episode of sustained fear. The record, however, supports his conviction for two counts of criminal threats against B.R. because a reasonable trier of fact could conclude the second threat was separate and distinct from the earlier threat, and therefore instilled a new prospect of immediate harm. The record, however, does support Rivera's claim his sentence for threatening M.H. must be stayed under section 654 because the threat shared the same objective as his kidnapping conviction, namely, to ensure M.H. did not report his crimes to the police. We therefore reverse with directions to the trial court to enter a stay under section 654 on count 8.

I

FACTUAL AND PROCEDURAL BACKGROUND

Rivera resided in an Anaheim apartment with M.H., the mother of his three children, including 14-year-old B.R. and two siblings ages six and under. During an earlier five-year separation in which Rivera did not live with M.H., she conceived a child with another man and bore a daughter named B. Rivera's jealously over M.H.'s affair festered, and eventually erupted on a February morning in 2012. Rivera and M.H. argued about the topic, and Rivera then turned his anger on B.R., demanding the man's name. When B.R. admitted she didn't know, he responded by throwing a plastic brush that

2

struck her head and by punching her in the face with his closed fist, bloodying her nose. M.H. attempted to intervene, but he also punched her in the face.

A male roommate shoved Rivera into a nearby bedroom, but Rivera quickly followed B.R. into another room and blamed her for, in failing to answer his question about B.'s paternity, "getting in the middle of a conversation between my mom and him." He had shown her one of his guns the day before, and now threatened to shoot her, stating "all he needed was two bullets to kill me." B.R. began crying and told him to stop because he was scaring her. When her mother took B.R. to bathroom to wash the blood from her face, Rivera followed and continued threatening to kill her. B.R. did not see a gun in his possession at the moment, but she feared for her life and her mother's.

M.H. instructed B.R. to "calm down" and succeeded in calming the situation enough that she and B.R.'s younger siblings remained in the apartment while B.R. departed for the laundry room, which was nearby on the same floor. When asked on cross-examination, "If you were in fact fearful[,] why did you leave that situation and leave your family there," B.R. explained, "I just thought it was going to be another day, we were just going to get over it." Once in the laundry room, B.R. encountered a neighbor, Maria, whom she implored to call the police ("I was in fear for my life, that's why I told Maria to call the police"). But Maria ignored her plea because she did not want to get involved. B.R. remained in the laundry room for a few minutes to gather the family's clothes.

She returned to the apartment and folded clothes in the family room for a few minutes before Rivera confronted her again and issued another threat. First, he elicited that Maria had been in the laundry room and demanded to know, "[W]hat did I tell Maria, why was I talking to her." When B.R. "told him that I didn't tell her anything," Rivera responded by threatening to kill her. She testified, "He told me that if the — that if the police were to come right now he was going to come back and he was

3

going to shoot both me and my mom." She explained his actual words were, "If the police come, [B.R.], I swear I'll come back and shoot you two bitches."

A short time later, B.R. heard Rivera and M.H. arguing again in the kitchen. She saw Rivera with a gun in his hand held behind his back, which he drew down to his side as M.H. struggled with him for it, with her hand on his arm. B.R. grabbed her sister J. and ran from the apartment.

M.H. explained in her testimony that Rivera had confronted her again, demanding to know the name of B.'s father. When she refused to tell him, Rivera struck her in the face with a blow that split her lip and knocked her unconscious on the floor. When she came to, Rivera stood over her with a gun in his waistband. She earlier had heard Rivera threaten B.R. in the living room when she returned from the laundry room that he would kill B.R. and M.H. if the police came.

Rivera told M.H. to stand, and when she responded, "No, please, no," Rivera threatened to kill her and asked, "You think I won't do it?" When she tried to grab the gun from him, but grabbed his wrist instead, he calmed down even though she tried "to take it away from him." She could not explain his reaction in her testimony ("What made him calm down?" "I don't know."). He put the gun away in his waistband behind his back.

After Rivera became calm, he ordered M.H. "to get up and for us to go out" because he expected the police to arrive. When she stood but refused to leave, he drew the gun again and pressed it against her back, forcing her to leave the apartment with him. As they were leaving, her young son ran to her and grabbed her hand. Rivera forced them to accompany him to a neighbor's open apartment, where he allowed them to hide in a closet. B.R. had called the police when she escaped, but Rivera departed before they arrived. Eventually apprehended, Rivera was convicted of various crimes, as noted above.

II

DISCUSSION

A.      *Multiple Criminal Threats*

Relying on *People v. Wilson* (2015) 234 Cal.App.4th 193 (*Wilson*), Rivera challenges his conviction for making multiple criminal threats against B.R.  As a preliminary matter, the Attorney General contends Rivera forfeited his challenge by not raising it below.  But although not phrased as such, Rivera's appeal challenges the sufficiency of the evidence because he contends the record shows any threats he made against her caused only a single episode of continuing fear, lawfully sufficient to support only one conviction.  A challenge to the sufficiency of the evidence is not forfeited by failing to object below.  (*People v. Rodriguez* (1998) 17 Cal.4th 253, 262; see *People v. Castillo* (2008) 168 Cal.App.4th 364, 369.)

To the contrary, due process requires that substantial evidence support every criminal conviction.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; *People v. Johnson* (1980) 26 Cal.3d 557, 576-578.)  Whether the evidence *could* support more than a single criminal threat conviction is a question of law that we review de novo, based on the elements of section 422.  (*Wilson*, *supra*, 234 Cal.App.4th at p. 198.)

Section 422, subdivision (a), provides, in pertinent part:  "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and *an immediate prospect of execution of the threat*, and *thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety*, shall be punished . . . ." (Italics added.)

The statutory language can be divided into five elements the prosecution must prove: "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and *an immediate prospect of execution of the threat*,' (4) that the threat actually caused the person threatened '*to be in sustained fear for his or her own safety or for his or her immediate family's safety*,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228 (*Toledo*), italics added.)

In *Wilson*, the victim returned home from purchasing groceries with his wife and encountered the defendant, who was apparently drunk, urinating on a tree in the victim's yard. Over the course of 15 to 20 minutes in a single, continuing confrontation with the victim as he unloaded the groceries, the defendant's verbal statements escalated from, "Fuck off. Everyone has to take a piss" to "I'm going to kill you and all your kids and your family" and "I'm going to kill you guys." (*Wilson*, *supra*, 234 Cal.App.4th at pp. 196-197.) The prosecutor charged the defendant with making two criminal threats against the victim: first, the initial threat that the victim discounted personally but caused him to fear for his family, especially his children, and second, the additional threat directed at the victim as the defendant moved closer, so that he feared "'not just my children's life anymore as protector and provider, but now also myself . . . .'" (*Id.* at pp. 197-198.)

After the jury convicted the defendant on both counts and the defendant appealed, a panel of this court reversed the defendant's second criminal threat conviction.

6

Because "[a] violation of section 422 is not complete upon the issuance of a threat," but instead "depends on the recipient of the threat suffering 'sustained fear' as a result of the communication," *Wilson* held: "It is not appropriate to convict a defendant of multiple counts under section 422 based on multiple threatening communications uttered to a single victim *during a brief, uninterrupted encounter*." (*Wilson*, *supra*, 234 Cal.App.4th at p. 201, italics added.)

The *Wilson* court observed that while section 422 "provides two alternative means by which the victim's fear could manifest itself — fear for oneself or fear for one's immediate family members," the Legislature did not enumerate these instances of fear as separate crimes in "separate statutory subdivisions," but rather "identif[ied] different circumstances in which the single crime defined by the statute can be committed." (*Wilson*, *supra*, 234 Cal.App.4th at pp. 201-202.) Consequently, the court "reject[ed] the notion that a single threat referencing violence against both a victim and his or her immediate family members, heard only by the victim, can constitute multiple offenses under section 422." (*Id.* at p. 201.)

Reviewing the threats against the victim (Rosales) in that case, *Wilson* also explained: "Neither defendant's utterance of more than one threat nor the shift in focus of Rosales's fear over the course of the ordeal justifies two section 422 convictions. From the moment defendant approached Rosales near his car and threatened to kill Rosales's family, the jury's guilty verdicts necessarily suggest Rosales was in sustained fear throughout the entirety of the confrontation. It does not matter whether Rosales's primary fear was for himself or members of his family at various times. Irrespective of the number of threatening statements and family members threatened, defendant was properly convicted of only one count under section 422 for his conduct toward Rosales." (*Wilson*, *supra*, 234 Cal.App.4th at p. 202.)

Rivera's reliance on *Wilson* is misplaced for the simple reason that here the jury reasonably could conclude the "immediate prospect of execution" necessary to

complete a criminal threat under section 422, subdivision (a), dissipated between the first and second threats uttered to the victim, unlike in *Wilson*. In *Wilson*, the victim always remained outside his home and engaged with the defendant in a single, continuing confrontation, or as *Wilson* put it, "a brief, *uninterrupted* encounter." (*Wilson*, *supra*, 234 Cal.App.4th at p. 201, italics added.)

Here, in contrast, B.R. moved from room to room within the apartment after Rivera first threatened that he needed only two bullets to kill her, M.H. succeeded in calming Rivera, and B.R. then left the apartment altogether. She went to the laundry room where she faced no immediate prospect of harm from Rivera. She failed to persuade Maria to call the police, but gathered the family's clothes from the dryer and apparently felt safe enough to return to the apartment. When she returned, defendant did not immediately confront her at the door or with renewed demands to reveal the identity of B's father. Instead, B.R. entered the apartment and continued folding clothes in the living "just trying to go along with [the] day as if nothing was happening." Only then did Rivera accost her, demanding to know what she had told Maria, and threatened to kill both her and her mother if anyone called the police.

Rivera argues that the whole episode constituted a single period of "sustained fear" for B.R., as for the victim in *Wilson*. But as noted above, B.R.'s departure to safety in the laundry room constituted a meaningful break in the events, after which Rivera issued a new criminal threat against her. The jury reasonably could conclude the threats were separate and distinct not only because Rivera uttered them at different times against B.R., separated by her departure to the laundry room and her return, but also in their intent and objective. He threatened to kill her the first time because she did not provide the information he wanted about B.'s parentage, which somehow led him to think B.R. was meddling or "getting in [his] argument" with M.H. And the second threat was designed to prevent B.R. from calling the police, by threatening to shoot her and M.H. if the police came.

More importantly, the facts here touch on an aspect of the "sustained fear" necessary for a criminal threat that *Wilson* did not have to discuss. A criminal threat must cause the victim more than a passing fright or scare. As *Wilson* noted, "Sustained fear occurs over 'a period of time "that extends beyond what is momentary, fleeting, or transitory."' [Citation.]" (*Wilson*, *supra*, 234 Cal.App.4th at p. 201.) But a distinct and equally important element is that the utterance must elicit fear in the victim because of "'"an immediate prospect of execution of the threat."'"" (*Toledo*, *supra*, 26 Cal.4th at p. 228.) Sustained fear and an immediate prospect of execution are related elements, but not identical, and both are required. (See *ibid.* [listing them as distinct parts of the fourth and fifth elements of a criminal threat, respectively].) Thus, where there is sustained fear, but no new threat or new prospect of its execution, it follows that there is only one criminal threat. And as illustrated in *Wilson*, where there is sustained fear and perhaps additional threats, but there exists in the "uninterrupted encounter" no new prospect of execution of the threats, there is only one actionable "'unit of prosecution'" under section 422. (*Wilson*, *supra*, 234 Cal.App.4th at pp. 199, 201.)

Here, however, where there is a new threat, a new prospect the threat will be executed, and a new period of sustained fear, and the other elements of a criminal threat under section 422 are also present (see *Toledo*, *supra*, 26 Cal.4th at p. 228), the defendant may be prosecuted and convicted of the new threat as well as prior ones. Of course, the prior threat or threats likely will color and deepen the victim's fear. But here the evidence was more than sufficient for a jury reasonably to conclude all the elements of multiple criminal threats were satisfied, namely in each instance: (1) the defendant willfully threatened to commit a crime resulting in death or great bodily injury; (2) the defendant specifically intended the communication as a threat; (3) the utterance conveyed a gravity of purpose and an immediate prospect of its execution; (4) causing sustained fear in the threatened person for oneself or for his or her family; and (5) the fear was reasonable. (*Ibid.*) Rivera's challenge to his dual convictions therefore fails.

9

B.      *Section 654*

Rivera also contends his sentence for making a criminal threat against M.H. must be stayed under section 654 because the threat necessarily reflected the same objective as his kidnapping conviction, i.e., "*to evade capture by the police* by moving to a different location." (Italics added.)  We conclude that even if Rivera had not formed the intent to kidnap M.H. when he initially threatened to kill her, the threat nevertheless necessarily reflected the same overarching intent and objective as the kidnapping that later followed:  to enforce M.H.'s silence.  In other words, the evidence demonstrated the purpose of Rivera's threat was to keep her from reporting his crimes to the police, and the purpose of the kidnapping was to physically ensure her silence by keeping her with him.

Section 654 provides: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  Section 654 applies where a single act violates more than one statute.  (*Neal v. State of California* (1960) 55 Cal.2d 11, 20 (*Neal*).)  As pertinent here, it also bars multiple punishment where a course of conduct violating more than one statute constitutes an indivisible criminal undertaking.  (*People v. Saffle* (1992) 4 Cal.App.4th 434, 438.)

Whether a course of conduct is divisible depends on the intent and objective of the actor.  (See *People v. McFarland* (1962) 58 Cal.2d 748, 762 [defendant could not be punished for both burglary and theft because his single objective upon entering building was to steal property]; *People v. Latimer* (1993) 5 Cal.4th 1203, 1211 (*Latimer*) [upholding judicially-created "'indivisible course of conduct'" rule, which allows separate punishment only if the defendant acted with a separate criminal objective or intent with respect to each """"act or omission"""].)  Where all the acts and offenses are "merely incidental to, or were the means of accomplishing or facilitating one objective, [the] defendant may be found to have harbored a single intent and therefore may be

10

punished only once." (*People v. Harrison* (1989) 48 Cal.3d 321, 335; *Neal*, *supra*, 55 Cal.2d at p. 19.) "On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations." (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135.)

The purpose of section 654 is to ensure that a defendant's punishment is commensurate with his or her culpability and that punishment is not imposed more than once for what is essentially one criminal act. (See *Latimer*, *supra*, 5 Cal.4th at p. 1211.) If, as here, the trial court makes no express findings regarding section 654, "a finding that the crimes were divisible is implicit in the judgment and must be upheld if supported by substantial evidence." (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717.)

The Attorney General asserts forfeiture, but it is well established that a defendant's failure to object in the trial court under section 654 does not forfeit the claim (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338; *People v. Le* (2006) 136 Cal.App.4th 925, 931) because an unauthorized sentence may be challenged for the first time on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 352-354.) The Attorney General overlooks that the Supreme Court has repeatedly stated: "'[T]he waiver doctrine does not apply to questions involving the applicability of section 654. Errors in the applicability of section 654 are corrected on appeal regardless of whether the point was raised by objection in the trial court or assigned as error on appeal.' [Citation.]" (*People v. Hester* (2000) 22 Cal.4th 290, 295.)

Here, Rivera knocked M.H. to the ground and unconscious when she would not reveal the identity of her daughter B's father. When she regained consciousness, he ordered her to "get up" but she refused, despite glimpsing the gun he held behind his back. He pulled the gun forward, and when she pleaded, "No, please, no," he responded, You think I won't do it," and expressly threatened to kill her. She reached for the gun, grasping him by that arm. Rivera calmed down and placed the gun in his waistband

11

behind his back. He told M.H. "to get up and for us to go out." When he told her, "Let's go," she stood and complied with his command to leave. While they were leaving, she hesitated and told him she did not want to go, but he drew the gun again and they departed.

In testifying about Rivera's threat to kill her, M.H. recalled that she had heard Rivera threaten B.R. in the living room a short time earlier, "If the police come, [B.R.], I swear I'll come back and shoot you two bitches [i.e., B.R. and M.H.]." The purpose of both threats reflects an intent to keep M.H. and B.R. from reporting him to the police. And M.H. similarly inferred as to the kidnapping that "[h]e wanted for us to go because the police were going to come."

The Attorney General suggests Rivera had no particular purpose in ordering M.H. to stand up or in threatening to kill her. But the threat followed immediately upon his initial command for her to "get up," and when Rivera reiterated the directive, he made clear his intent was not simply for her to rise, but "to get up and for us to go out."

The Attorney General also suggests that while M.H. and Rivera both knew B.R. had left the apartment in fright when she saw Rivera standing over M.H. with a gun, Rivera may have been "unaware of police being summoned or [that they] would be soon arriving." But regardless of Rivera's imprecise knowledge of where the police were at a given moment, the evidence demonstrated his concern in threatening M.H. and in kidnapping her was to prevent M.H. from disclosing his offenses to the police. Indeed, even if Rivera only formed the intent to kidnap M.H. after he first told her to stand up, the record shows his intent and objective in both the threat and the kidnapping was to enforce her silence. In one instance, he sought to compel her silence by means of a threat, and in the other, by forcing her to accompany him so she remained under his control and could not report him. Because the evidence demonstrates he committed both offenses pursuant to a single intent and objective, the trial court was required to enter a stay on the lesser of the two, i.e., the threat conviction on count 8.

12

## III

## DISPOSITION

The judgment is affirmed in all respects except as to the sentence imposed on count 8. We direct the trial court to enter a stay on that count under section 654, and to forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.


ARONSON, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.